IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-00040-01/02-CR-W-HFS |
| | ) | |
| JOSHUA R. TILLMAN, and | ) | |
| SHAWNDREY DEMOND REYNOLDS, | ) | |
| | ) | |
| Defendants. | ) | |

### REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendants' Joint Motion to Suppress (Doc. #31). For the reasons set forth below, it is recommended that this motion be denied.

### I. INTRODUCTION

On February 7, 2018, a Criminal Complaint was filed against defendant Joshua R. Tillman. On February 21, 2018, the grand jury returned a one-count Indictment against defendants Tillman and Shawndrey Demond Reynolds. The Indictment charges that on or about February 6, 2018, defendants, having been convicted of at least one crime punishable by imprisonment for a term exceeding one year, aiding and abetting each other, knowingly possessed firearms and ammunition, to wit: a Glock Model 22, .40 caliber semi-automatic handgun loaded with nineteen rounds of 9 mm ammunition in the attached magazine and one 9 mm round in the chamber, a Springfield Armory XD9, 9 mm semi-automatic handgun loaded with thirteen rounds of 9 mm ammunition in the attached magazine and one 9 mm round in the chamber, twenty-five rounds of Fiocchi brand .45 caliber ammunition, and a handgun extended magazine containing twenty-four rounds of .45 caliber ammunition.

On January 25, 2019, an evidentiary hearing was held on Defendants' Joint Motion to Suppress. Defendant Tillman was represented by appointed counsel, Mark A. Thomason. Defendant Reynolds was represented by appointed counsel, John Jenab. The Government was represented by Assistant United States Attorney Bruce A. Rhoades. The Government called FBI Special Agent Michael G. Mrachek as a witness. The defense called Danielle Saffold to testify.

## II. FACTS

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On February 6, 2018, FBI Special Agent Michael G. Mrachek was the coordinator of the Fugitive Violent Crimes Task Force. (Tr. at 3.) At that time, the Task Force was composed of officers from the Kansas City, Missouri Police Department, the Kansas City, Kansas Police Department, the Johnson County, Kansas Sheriff's Department, and the Independence, Missouri Police Department. (Tr. at 3.) The Task Force was charged with executing arrest warrants for people wanted in those jurisdictions. (Tr. at 3.)

2. On February 6, 2018, at approximately 7:30 a.m., Special Agent Mrachek, along with Task Force Officers John Cooley, Shane Gaddis, Larry Chronister, and Aaron Gietzen, was conducting surveillance on 3800 East 69th Street in Kansas City, Missouri, looking for Ronnie Scott, a bank robbery suspect who was wanted on a federal arrest warrant. (Tr. at 4.) Special Agent Mrachek had information that the house at this address was owned by Scott's family. (Tr. at 4.) The officers had identity information for Scott, i.e. height, weight, pictures of him (Def. Exhs. 502, 503), hairstyle, etc. (Tr. at 7, 38.) The officers were conducting surveillance to see if they could identify Scott coming or going from the house. (Tr. at 4.) Each officer had his own vehicle. (Tr. at 5.) Special Agent Mrachek was located half a block southwest looking through a lightly wooded area where he could see the street and the house. (Tr. at 5.) The other officers were located so that they would have different viewpoints and also be in a position to react if Scott was identified. (Tr. at 5.) At some point, Task Force Officer Gietzen left the scene, leaving Special Agent Mrachek and Task Force Officers Cooley, Gaddis, and Chronister to continue the surveillance. (Tr. at 6.)

2

3.  At approximately 9:20 a.m., Special Agent Mrachek observed a silver SUV pull around the corner in front of the house and back into the driveway. (Tr. at 6.) Special Agent Mrachek was not able to see who was in the vehicle. (Tr. at 6.) No one exited the vehicle. (Tr. at 7.) After approximately fifteen minutes, Special Agent Mrachek asked two of the officers to drive by the vehicle to see if they could get a view of the occupant. (Tr. at 7.) Task Force Officer Gaddis did a drive-by, but stated that he could not see anything definitive. (Tr. at 7.) Task Force Officer Chronister did a subsequent drive-by and advised that the driver was similar in appearance to Ronnie Scott, that "it's a possibility that he's our guy." (Tr. at 7, 46.) The officers could not run the tags on the vehicle because the vehicle was backed in and there was no license plate on the front of the vehicle. (Tr. at 34.) Special Agent Mrachek made the decision to approach the vehicle. (Tr. at 8.) Special Agent Mrachek testified that the reason for the approach was to arrest Ronnie Scott. (Tr. at 49.) Special Agent Mrachek advised the other officers that he would pull his vehicle in front of the vehicle backed into the driveway, blocking the vehicle. (Tr. at 11.) The other officers would take up positions around him and in the rear of the residence. (Tr. at 11.) The officers would conduct "a felony car-type stop" of the vehicle. (Tr. at 11.)

4.  Special Agent Mrachek explained that in a felony car stop, officers give verbal commands for the occupants of the vehicle to exit one at a time. (Tr. at 11.) For officer safety reasons, they are directed to back towards the officers. (Tr. at 11.) The officers give the commands from a position of cover with their firearms drawn. (Tr. at 11.) Special Agent Mrachek testified that these precautions were necessary for officer safety considering it was a bank robbery warrant. (Tr. at 48.)

5.  Special Agent Mrachek pulled his vehicle into the driveway facing the vehicle which was backed into the driveway. (Tr. at 11.) Special Agent Mrachek activated the emergency lights on his unmarked police vehicle, opened his door, and began giving verbal demands, initially from behind the door of his vehicle. (Tr. at 12.) Special Agent Mrachek estimated that he was approximately ten feet from the individual in the driver's seat of the vehicle. (Tr. at 13-14.) This was the first time Special Agent Mrachek was able to see the individual in the driver's seat as he was not in a position to see inside the vehicle from his original surveillance position. (Tr. at 15.) Special Agent Mrachek testified that the individual in the driver's seat was not initially responding to Mrachek's verbal commands to show his hands and to exit the vehicle. (Tr. at 15.) Special Agent Mrachek did not realize there was a passenger in the vehicle until Task Force Officer Cooley, who was to Mrachek's left, advised him of the passenger. (Tr. at 14, 16.) Special Agent Mrachek then repositioned himself to the other side of his vehicle for security purposes. (Tr. at 15.)

6.  Task Force Officer Chronister was located at the back of the residence to ensure that no one was going to come out from there. (Tr. at 19.) Task Force Officer

3

Gaddis was on Special Agent Mrachek's right side. (Tr. at 19.)

7. Special Agent Mrachek testified that he continued to give verbal commands for the driver to exit the vehicle. (Tr. at 20.) Special Agent Mrachek testified "there [were] things going on in there or just general being startled or something going on that he did not … immediately respond to my demands." (Tr. at 21.) Eventually, the driver came out, walked back to the officers, and was taken into custody. (Tr. at 20.) Special Agent Mrachek and Task Force Officer Gaddis dealt with the driver (later identified as Shawndrey Reynolds). (Tr. at 21, 49.) Task Force Officer Cooley dealt with getting the passenger (later identified as Joshua Tillman) out of the vehicle after the driver was secured. (Tr. at 20-23, 49.) Special Agent Mrachek testified that when the two individuals exited the vehicle, all the officers could smell the odor of marijuana coming from the vehicle. (Tr. at 31.)

8. Special Agent Mrachek testified that after the driver and the passenger were both secured and handcuffed, the next task was for an officer to clear the vehicle to make sure there were no other occupants posing a danger to the officers at the scene. (Tr. at 21, 24.) Task Force Officer Gaddis[1] went alongside the vehicle to view the inside to make sure there were no other occupants in it. (Tr. at 24.) Task Force Officer Gaddis determined that there was nobody else in the vehicle, but he did view a gun. (Tr. at 25.) Special Agent Mrachek testified that the handgun was in plain view on the floorboard on the driver's side. (Tr. at 31.) The officers did not attempt to retrieve the handgun at that time. (Tr. at 25.)

9. Special Agent Mrachek testified that at this point, the officers were pretty sure that neither of the individuals they had handcuffed was Ronnie Scott. (Tr. at 25.) However, the individuals were not released because of the handgun in plain view in the vehicle, as well as the odor of marijuana coming from the vehicle. (Tr. at 49-50.) The officers attempted to identify these individuals and to find out what their association was to the residence. (Tr. at 25.) Special Agent Mrachek testified that the officers were fairly certain as to the identity of one of the individuals, Joshua Tillman, but the other one they were not. (Tr. at 26, 30-31.) Tillman gave the officers his name and said that he was on parole for robbery in Kansas. (Tr. at 31.) Special Agent Mrachek understood this to mean that Tillman was a convicted felon. (Tr. at 31.) At some point, Task Force Officer Cooley contacted a sergeant who authorized a hold of Tillman for investigation of being a felon in possession. (Tr. at 51.) Uniformed officers were called to the scene to assist in overseeing the two handcuffed individuals and the vehicle containing the gun, while the task force officers dealt with the house. (Tr. at 27.)

---

[1]Special Agent Mrachek testified that he mistakenly testified during the preliminary/detention hearing and in his affidavit in support of the Criminal Complaint for defendant Tillman that Task Force Officer Cooley had cleared the vehicle. (Tr. at 53-54.)

4

10. Special Agent Mrachek testified that "the house was still hot," meaning that it had not been cleared and Ronnie Scott, the bank robbery suspect, could be in the house. (Tr. at 26.) After the officers approached the house and announced their purpose for being there, Ronnie Scott opened the door and was placed under arrest. (Tr. at 29.) Officers cleared the house. (Tr. at 29.) No other occupants were found. (Tr. at 29.)

11. Special Agent Mrachek and Task Force Officer Gaddis then went to the transport van where the two individuals from the vehicle were being held. (Tr. at 30.) The uniformed officers who had been called to oversee these individuals were still trying to identify the one individual, Shawndrey Reynolds. (Tr. at 30.) Reynolds had given the officers names, but they were unable to verify that the information provided was correct. (Tr. at 30.) Special Agent Mrachek and Task Force Officer Gaddis took a mobile fingerprint reader to the back of the transport van and fingerprinted Reynolds. (Tr. at 30.) They found that Reynolds was wanted for robbery in Clay County and that he had a pick-up from the Kansas City, Missouri Police Department for murder. (Tr. at 30.) At that point, Reynolds was placed under arrest. (Tr. at 51.) It was also determined that Reynolds was a convicted felon. (Tr. at 30.)

12. Task Force Officer Cooley conducted a search of the vehicle. (Tr. at 31.) Special Agent Mrachek stated the basis for the search was the odor of marijuana coming from the vehicle and the handgun in plain view on the floorboard on the driver's side. (Tr. at 31.) In addition to this handgun, Task Force Officer Cooley found another gun on the floorboard on the passenger's side. (Tr. at 32.) There were also controlled substances found in the center console and some marijuana in the pocket on the driver's door. (Tr. at 32.) The vehicle was determined to be fraudulently registered[2] and it was towed from the scene. (Tr. at 32-33.)

### III. DISCUSSION

Defendants seek to suppress "all evidence obtained as a result of the illegal detention of their persons and the illegal search of the vehicle they were occupying, in violation of each Defendant's Fourth Amendment right to be free from unreasonable searches and seizures." (Defendants' Joint Motion to Suppress; Doc. #31 at 1.) Specifically, defendants argue that the police had no reasonable suspicion to justify an investigative detention of them or their vehicle.

---

[2]Danielle Saffold testified that she owned the vehicle. (Tr. at 64.) She had allowed defendant Reynolds to borrow the vehicle. (Tr. at 65.) Ms. Reynolds testified that she had not yet paid the title fees for the vehicle. (Tr. at 65.)

5

(*Id.* at 6.)  Defendants argue that the officers should have initiated a consensual encounter with them and that they were searched before officers had any indication they may be armed or dangerous.  (*Id.* at 6, 8.)  Defendants argue that once officers concluded that neither occupant was the fugitive Ronnie Scott, they should have been allowed to leave.  (*Id.* at 7.)  According to defendants, there were no grounds to extend the search to the vehicle.  (*Id.* at 8.)  Finally, defendants argue that because the police violated the Fourth Amendment when they seized them and searched their vehicle, all evidence recovered from the vehicle must be suppressed as fruit of the poisonous tree.  (*Id.* at 10.)

      A.      <u>Constitutionality of the Stop</u>

Defendants Tillman and Reynolds argue that the police had no reasonable suspicion to justify an investigative detention of them or their vehicle. (Defendants' Joint Motion to Suppress; Doc. #31 at 6.)

The vehicle in which defendants were sitting was stopped as a result of law enforcement attempting to execute a federal arrest warrant for Ronnie Scott, a bank robbery suspect.  As set forth in *United States v. Shields*, 519 F.3d 836, 837 (8th Cir. 2008), when officers have reason to believe that a person for whom they have a valid arrest warrant is within a vehicle, the officers are justified in conducting a car stop.  Evidence was presented at the hearing to show that the house at 3800 East 69th Street, Kansas City, Missouri, was owned by Scott's family.  (Fact No. 2.)  Officers were conducting surveillance to see if they could identify Scott coming or going from the house.  (*Id.*)  Officers had identity information for Scott, i.e. height, weight, pictures of him, and hairstyle.  (*Id.*)  Officers observed a vehicle pull around the corner in front of the house at 3800 East 69th Street and back into the driveway.  (Fact No. 3.)  Officers could not run the tags on the vehicle because the vehicle was backed in and there was no license plate on

the front of the vehicle.  (*Id.*)   After approximately fifteen minutes, two of the officers separately drove by the vehicle to see if they could get a view of who was in the vehicle.  (*Id.*) One of the officers believed that the driver of the vehicle was similar in appearance to Ronnie Scott, that "it's a possibility that he's our guy."  (*Id.*)   The decision was made to approach the vehicle in an attempt to arrest Ronnie Scott.  (*Id.*)   Based on this evidence, the Court finds that the officers had reason to believe that Ronnie Scott, a person for whom they had a valid arrest warrant, was within the vehicle.   The officers were justified in conducting the car stop.

B.    The Seizure of Defendants

Defendants Tillman and Reynolds argue that the officers should have initiated a consensual encounter with them and that they were searched[3] before officers had any indication that they may be armed or dangerous.   (Defendants' Joint Motion to Suppress; Doc. #31 at 6, 8.)

"[A] police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time."  *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)(citing *United States v. Jones*, 759 F.2d 633, 636-37 (8th Cir.), *cert. denied*, 474 U.S. 837 (1985)).   A police officer may conduct a pat-down search of the suspect during an investigative stop if the officer has reason to believe that such person might be armed and dangerous.  *See Terry v. Ohio*, 392 U.S. 1, 30 (1968).   Protective measures also allow for the use of handcuffs.  *See United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013)("[p]olice officers reasonably may handcuff a suspect during the course of a *Terry* stop to protect their personal safety"); *United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009); *United States v.*

---

[3]No evidence was presented at the hearing relating to a search of defendants' persons or that any evidence was seized from defendants' persons.   The Court assumes that the officers conducted a pat-down search of both defendants.

7

*Martinez*, 462 F.3d 903, 907 (8th Cir. 2006), *cert. denied*, 549 U.S. 1272 (2007).

The officers initiated a felony car stop. (Fact No. 4.) In a felony car stop, officers give verbal commands for the occupants of the vehicle to exit one at a time. (*Id.*) For officer safety reasons, they are directed to back towards the officers. (*Id.*) The officers give the commands from a position of cover with their firearms drawn. (*Id.*) Special Agent Mrachek testified that the individual in the driver's seat was not initially responding to Mrachek's verbal commands to show his hands and to exit the vehicle. (Fact No. 5.) Special Agent Mrachek continued to give verbal commands for the driver to exit the vehicle. (Fact No. 7.) Eventually, the driver came out and was taken into custody. (*Id.*) The passenger was then directed out of the vehicle. (*Id.*) Both the driver and the passenger were handcuffed. (Fact No. 8.) Task Force Officer Gaddis then cleared the vehicle to make sure there were no other occupants posing a danger to the officers at the scene. (*Id.*) Given the officers' belief that Ronnie Scott, a bank robbery suspect, was within the vehicle, the officers had a credible concern for officer safety. The Court finds that the officers' actions in bringing each person out of the vehicle and handcuffing them were reasonably necessary to protect the officers' personal safety and to maintain the status quo so that the officers could determine whether Ronnie Scott was in the vehicle.

    C.    <u>Continued Detention of Defendants</u>

Defendants Tillman and Reynolds argue that they were detained beyond the permissible scope of the stop, which was to determine whether Ronnie Scott was in the vehicle. (Defendants' Joint Motion to Suppress; Doc. #31 at 7.)

Further detention after the point at which the purpose of the stop is resolved is not unlawful if there is evidence to support a claim of reasonable suspicion beyond that which led to the initial stop. *See Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609, 1616-17 (2015).

8

Prior to the determination that Ronnie Scott was not in the vehicle, the officers were presented with evidence that the individuals in the vehicle were involved in criminal activity. Special Agent Mrachek testified that when the two individuals exited the vehicle, all the officers could smell the odor of marijuana coming from the vehicle. (Fact No. 7.) While defense counsel state that "Cooley[4] rather conveniently claims to smell 'the odor of burned marijuana' emanating from the vehicle after the occupants exited,"[5] the Court finds the testimony of Special Agent Mrachek credible. The Court finds that the officers had a particularized and objective basis for suspecting legal wrongdoing which provided a sufficient basis for seizing defendants Tillman and Reynolds. Further, upon clearing the vehicle to make sure there were no other occupants posing a danger to the officers at the scene, Task Force Officer Gaddis viewed a handgun in plain view on the floorboard on the driver's side. (Fact No. 8.) Defendant Tillman gave the officers his name and said that he was on parole for robbery in Kansas. (Fact No. 9.) Special Agent Mrachek understood this to mean that Tillman was a convicted felon. (*Id.*) Defendant Tillman was then held for investigation of being a felon in possession. (*Id.*) Defendant Reynolds was eventually identified through the use of a mobile fingerprint reader. (Fact No. 11.) It was determined that Reynolds was wanted for robbery in Clay County, that he had a pick-up from the Kansas City, Missouri Police Department for murder, and that he was a convicted felon. (*Id.*) Defendant Reynolds was placed under arrest. (*Id.*) The Court finds that defendants were properly detained and then arrested.

---

[4]The Affidavit given in support of the Criminal Complaint states that Task Force Officer Cooley indicated that the vehicle smelled of marijuana when he conducted the car check. (Doc. #1-1 at ¶ 7.) The Court notes that the Affidavit further states that both Tillman and Reynolds smelled of marijuana. (*Id.* at ¶ 5.)

[5](Defendants' Joint Motion to Suppress; Doc. #31 at 8.)

D.  Warrantless Search

Defendants Tillman and Reynolds argue that there were no grounds to extend the search to the vehicle. (Defendants' Joint Motion to Suppress; Doc. #31 at 8.)

In *Arizona v. Gant*, 556 U.S. 332 (2009), the United States Supreme Court provided the following basic guidance when analyzing a warrantless search of a vehicle:

> Consistent with our precedent, our analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967)(footnote omitted).

*Gant*, 556 U.S. at 338. One of the established exceptions to the warrant requirement that the Court listed was the "automobile exception." The Court stated:

> Other established exceptions to the warrant requirement authorize a vehicle search under additional circumstances when safety or evidentiary concerns demand. . . . If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found. . . . *Ross* allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader.

*Gant*, 556 U.S. at 346-47. *See also United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) (automobile exception permits warrantless search of vehicle if police had probable cause to believe vehicle contained contraband before search began). "Probable cause exists 'where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006)(quoting *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005)).

As set forth above, when defendants Tillman and Reynolds exited the vehicle, all the officers could smell the odor of marijuana coming from the vehicle. (Fact No. 7.) The Court

10

finds that the observations of the officers created a fair probability that marijuana would be found inside the vehicle. *See United States v. Walker*, 840 F.3d 477, 483-84 (8th Cir. 2016)(odor of unburned marijuana provided probable cause to search car); *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000)(probable cause to search vehicle and its containers for drugs existed when officer smelled raw marijuana inside vehicle).

Further, upon clearing the vehicle to make sure there were no other occupants posing a danger to the officers at the scene, Task Force Officer Gaddis viewed a handgun in plain view on the floorboard on the driver's side. (Fact No. 8.) After it was determined that defendants Tillman and Reynolds were convicted felons and, thus, prohibited from possessing a firearm, probable cause existed to believe the vehicle contained evidence of the crime of felon in possession of a firearm.

Thus, pursuant to the automobile exception, the officers were authorized to conduct a warrantless search of the vehicle.

### E. Fruit of the Poisonous Tree

Finally, defendants Tillman and Reynolds argue that because the police violated the Fourth Amendment when they seized them and searched their vehicle, all evidence recovered from the vehicle must be suppressed as fruit of the poisonous tree. (Defendants' Joint Motion to Suppress; Doc. #31 at 10.)

Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and verbal evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). As set forth above, the Court finds that the seizure of defendants and the search of the vehicle were lawful. Therefore, defendants' fruit of the poisonous tree argument must also fail.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendants' Joint Motion to Suppress (Doc. #31).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge